Fatal **IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

Tosha Miller,

    Plaintiff,

                                  Case No. 2:05-cv-425

    v.

                                  JUDGE GRAHAM

City of Columbus, et al.,

    Defendants.

## OPINION AND ORDER

This matter is before the Court on Defendants' Motion for Summary Judgment (Doc. 86). For the following reasons, Defendants' Motion is GRANTED IN PART and DENIED IN PART.

The case arises out of the fatal shooting of Plaintiff Daunte Miller ("Miller"), son of Tosha Miller ("Plaintiff"), on August 6, 2003. The Defendants named in Plaintiff's First Amended Complaint (Doc. 19) are: the City of Columbus, Ohio ("City"); Columbus Division of Police Chief James Jackson ("Jackson"); Sgts. Anthony Luzio ("Luzio") and Andy Beeler ("Beeler"); and Columbus Police Officers Bruce Beard ("Beard"), Doug Wilkinson ("Wilkinson"), Bryan Maselli ("Maselli"), Dale Surbaugh ("Surbaugh"), John Chapman ("Chapman"), and Kevin Wangler ("Wangler"); and Columbus Police Detective Patrick Dorn ("Dorn"). Plaintiff has sued the individual defendants in their individual and official capacities.

In her First Amended Complaint, Plaintiff, as the personal representative of Miller's estate, asserted claims under 42 U.S.C. § 1983 against the City and all individual Defendants for violations of Miller's Fourth, Fifth, and Fourteenth Amendment rights, and under §§ 1983 and 1985 against the City and the

individual Defendants for conspiracy.  The First Amended Complaint included claims against Jackson, Luzio, Beeler, and Dorn for supervisory liability and against Jackson for tolerating or acquiescing in the officers' excessive use of force.  Plaintiff asserted claims under Ohio law against the City for Wilkinson's negligent operation of a motor vehicle, and against all Defendants for the intentional infliction of emotional distress and wrongful death.  Plaintiff asserted equal protection and privileges and immunities claims under §§ 1981, 1983, 1985, and 1986.  Finally, Plaintiff asserted a survival action pursuant to Oh. Rev. Code § 2305.21.

In Plaintiff's Response to Defendants' Motion for Summary Judgement (Doc. 116), she asserts the following claims:

1)  violation of § 1983 against the City and Jackson for the failure to investigate/ratification of Miller's shooting and for the failure to train;
2)  violation of § 1983 against Beard, Luzio, and Wilkinson for the use of excessive and deadly force under the Fourth Amendment;
3)  civil conspiracy in violation of § 1983 against Dorn, Luzio, and Beard;
4)  supervisory liability under § 1983 against Jackson;
5)  negligent operation of a motor vehicle under Ohio law against Wilkinson[1]; and,
6)  intentional infliction of emotional distress under Ohio law against Beard, Luzio, and Wilkinson.

(Plf.'s Res. to Defs.' Mot. for Summ. J. 1.)

Plaintiff voluntarily dismissed her § 1983 excessive force and civil conspiracy claims against the other individual Defendants

---

[1]

In Plaintiff's Response, she argues that the City is not statutorily immune for Wilkinson's negligent operation of the motor vehicle.  The Court accordingly treats this claim as one against the City for its employee's negligent operation of a motor vehicle.

pursuant to her Response. (Pl.'s Res. to Defs.' Mot. for Summ. J. 1.) Plaintiff has not put forth any evidence showing any issues of material fact to be resolved at trial under Fed. R. Civ. P. 56 in her Response as to her claims for supervisory liability against Luzio, Beeler, and Dorn; claims under 42 U.S.C. §§ 1981, 1985(3), and 1986; or intentional infliction of emotional distress against the individual Defendants except for Beard, Luzio, and Wilkinson. Accordingly, the Court considers these claims to have been abandoned.

## I. __SUMMARY JUDGMENT STANDARD__

Under Fed. R. Civ. P. 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." See LaPointe v. United Autoworkers Local 600, 8 F.3d 376, 378 (6th Cir. 1993); Osborn v. Ashland Cty, Bd. of Alcohol, Drug Addiction & Mental Health Servs., 979 F.2d 1131, 1133 (6th Cir. 1992)(per curium).

The moving party has the burden of showing that there are no genuine issues of material fact in the case. LaPointe, 8 F.3d at 378. The moving party may meet its burden by showing that the nonmoving party lacks evidence to support an essential element of its case. Barnhart v. Pickrel, Schaeffer & Ebeling Co., L.P.A., 12 F.3d 1382, 1389 (6th Cir. 1993).

In response, the nonmoving party "cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must 'present affirmative evidence in order to defeat a

properly supported motion for summary judgment.'" <u>Street v. J. C.</u> <u>Bradford & Co.</u>, 886 F.2d 1472, 1476 (6th Cir. 1989) (quoting <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 257 (1986)).  The Court must view the evidence, all facts, and any inferences that may permissibly be drawn from the facts in the light most favorable to the nonmoving party. <u>Matsushita Elec. Indus. Co. v. Zenith</u> <u>Radio Corp.</u>, 475 U.S. 574, 587 (1986). <u>See also</u> <u>Eastman Kodak Co.</u> <u>v. Image Technical Servs., Inc.</u>, 504 U.S. 451, 456 (1992).

In reviewing summary judgment motions, "this Court must determine whether 'the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" <u>Patton v. Bearden</u>, 8 F.3d 343, 346 (6th Cir. 1993)(quoting <u>Anderson</u>, 477 U.S. at 251-52).  However, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." <u>Anderson</u>, 477 U.S. at 247-48 (emphasis in original); <u>see</u> <u>generally</u> <u>Booker v. Brown & Williamson</u> <u>Tobacco Co., Inc.</u>, 879 F.2d 1304, 1310 (6th Cir. 1989).

Thus, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." <u>Anderson</u>, 477 U.S. at 252. <u>See also</u> <u>Gregory v. Hunt</u>, 24 F.3d 781, 784 (6th Cir. 1994).

Finally, a district court considering a motion for summary judgment may not weigh evidence or make credibility determinations. <u>Adams v. Metiva</u>, 31 F.3d 375, 379 (6th Cir. 1994).

**II.  <u>FACTS</u>**

**A.   Miller's Previous Conviction**

On April 11, 2002, Miller plead guilty to the Fifth Degree Felony of Possession of Cocaine in violation of Oh. Rev. Code § 2925.11 in the Common Pleas Court of Franklin County, Ohio.  The court found Miller guilty and sentenced him to two years of Community Control.

On April 3, 2003, Miller was declared an absconder by the Common Please Court of Franklin County, after apparently having failed to report to the Probation Office anytime after November 21, 2002.  The court ordered that Miller's probationary period be suspended pursuant to Oh. Rev. Code § 2951.07 until Miller was taken into custody or presented to the court for further disposition.  On April 9, 2003, the court issued a warrant for Miller's arrest on his previous drug possession conviction.

**B.   The Columbus Division of Police Strategic Response Bureau's Tactical Arrest Operation**

During August of 2003, the Strategic Response Bureau ("SRB") of the Columbus Division of Police was making tactical arrests involving felony suspects in the area of Town Street and McDowell Street area in Columbus.  On August 6, 2003, the SRB was attempting to locate up to twenty individuals with outstanding felony warrants, serve the warrants, and arrest the wanted individuals.

Surbaugh was serving in the Enforcement Section of the SRB. Surbaugh, along with Chapman and Wangler,[2] all in plain clothes, met around noon for a briefing of the operation.  They were stationed inside a warehouse at 480 West Town Street to identify

---

[2]

On August 6, 2003, Chapman and Wangler were temporarily assigned to the SRB.  Their usual assignment was patrolling the 8th Precinct.

suspects and contact marked police cruisers to stop and arrest those suspects.

### 1. *Maselli and Wilkinson*

Maselli and Wilkinson[3] were temporarily assigned to the SRB to assist with arrests.  That afternoon, they were in uniform, riding in a marked police cruiser.  Wilkinson was driving the cruiser.

### 2. *Luzio and Beard*

Luzio and Beard were working special assignments with the SRB. Luzio was the SRB Community Liaison Sergeant and Beard was assigned to assist the SRB.[4]  Luzio testified in his affidavit that at a briefing prior to the "roundup," the officers were advised of the dangerousness of a number of the targeted individuals.  Luzio and Beard were in uniform and riding in a marked police cruiser as "rovers" to provide assistance with the arrests.  Beard was driving the cruiser.  Beard testified in his affidavit that in that area of Columbus, "it was not uncommon for individuals . . . to carry handguns and we were advised during roll call that some wore bulletproof vests."  (Defs.' Mot. for Summ. J., Beard Aff. ¶ 2.)

### C. The Events of August 6, 2003

#### 1. *Miller is spotted by Chapman, Surbaugh, and Wangler*

During the afternoon of August 6, Malik West ("West"), a friend of Miller's, and Miller left a residence in the Riverside Bradley Housing Projects to find marijuana.  West testified in his deposition that he saw Miller's nine millimeter gun and was

---

[3]

Maselli and Wilkinson were also normally assigned to the 8th Precinct.  The 8th Precinct is an area described by Maselli (and Wilkinson) as containing "high drug and criminal activity."  (Defs. Mot. for Summ. J., Maselli Aff. ¶ 2.)

[4]

Beard's regular assignment was as an SRB Community Liaison Officer.

interested in purchasing it, but that Miller denied his request. (Defs.' Mot. for Summ. J., West Dep. 14:5-16, March 8, 2006.) West testified that he told Miller to leave the gun at the residence because "all the cops knew us out there." (Defs.' Mot. for Summ. J., West Dep. 14:17-15:8.) West testified that Miller had the gun when they left the Riverside Bradley residence. (Defs.' Mot. for Summ. J., West Dep. 16:6-13.) According to West, as he and Miller were walking on McDowell Street, a police officer drove past them, but kept driving. The pair kept walking down McDowell Street.

From their lookout on Town Street, Chapman and Wangler recognized Miller and West walking northbound on McDowell Street. Both recalled that Miller had an outstanding felony warrant for his arrest. Chapman contacted Maselli to let him know where they spotted Miller, that there was an outstanding warrant for his arrest, his direction of travel, and what Miller was wearing. Maselli received the information shortly before 1:00 p.m. Maselli and Wilkinson headed westbound on State Street looking for Miller. At some point, Maselli and Wilkinson accessed the Law Enforcement Automated Data System ("LEADS") through their on board computer and during the altercation with Miller confirmed that Miller had a felony arrest warrant for his probation violation.[5]

Shortly before 1:00, Luzio and Beard heard that Miller had been observed on McDowell Street, near Town Street and that he had an outstanding felony warrant. Luzio testified in his affidavit that Miller was not a target of the operation. (Defs.' Mot. for

---

[5] There is a discrepancy as to when Maselli and Wilkinson verified Miller's outstanding warrant, however, by the time Miller began to flee, both Maselli and Wilkinson testified that they had confirmed his outstanding Warrant on LEADS.

Summ. J., Luzio Aff. ¶ 3.)  Miller was identified as wearing a football jersey; Beard knew Miller by sight.

### 2.    *Maselli and Wilkinson attempt to engage Miller*

Maselli and Wilkinson passed West and Miller as they were driving westbound on State Street.  Maselli and Wilkinson did a U-turn and stopped their cruiser facing north on Lucas Street (south of State Street).  West saw the officers do the U-turn and noted that they were in a marked cruiser and in uniform.  Maselli and Wilkinson noted that West and Miller passed their car and then doubled-back and walked in front of the cruiser again.  Maselli and Wilkinson pulled up next to the pair to take Miller into custody.

West testified that the officers told Miller to stop and Miller ran, and that at this point he still had the nine millimeter gun at his waist with his shirt over the gun.  (Defs.' Mot. For Summ. J., West Dep. 21:1-18.)  Maselli and Wilkinson testified in their affidavits that Wilkinson tried to ask Miller about a pit bull while Maselli exited the cruiser to apprehend Miller.  Both Maselli and Wilkinson testified that Miller looked like he was about to run and that he then took off running eastbound on State Street and then turned south onto Lucas Street.  Luzio and Beard heard a radio report that Miller was running from the police.

### 3.    *Miller flees southbound on Lucas Street*

Maselli continued to chase Miller on foot while Wilkinson pursued Miller southbound on Lucas Street in the cruiser.  Maselli testified that he yelled "stop, you're under arrest" several times to Miller.  Wangler, Surbaugh, and Chapman testified that two to three minutes after notifying Maselli and Wilkinson of Miller's presence, they heard over the radio that Miller was running south

on Lucas Street, and that he had a gun. They also testified that they heard people yelling outside that Miller had a gun. Wangler, Surbaugh, and Chapman went to exit the south side of the warehouse.

West followed behind Miller and the officers and saw Miller run down Lucas Street, up to some train tracks, which Maselli and Wilkinson described as stemming from a gravel embankment running north-south over Town Street. Maselli pursued Miller up the embankment. Wilkinson passed Miller and Maselli in the cruiser. West testified that he could not see what happened while Miller and the officers were up the hill for ten to fifteen seconds.

### 4. *Wilkinson bumps Miller with the cruiser*

Wilkinson approached Miller, slowing the speed of the cruiser so he could exit and chase Miller on foot when Miller crossed in front of the cruiser, moving from the driver's side to the passenger's side. Wilkinson testified he "clearly observed Miller reaching into his front waistband . . . ma[ke] a distinct motion with his right arm, jerking upward, and . . . looked back at me." (Defs.' Mot. for Summ. J., Wilkinson Aff. ¶ 9.) Maselli testified that near the top of the embankment, he saw Miller "try to get something out of the front of his pants." (Defs.' Mot. for Summ. J., Maselli Aff. ¶ 10.) Wilkinson testified that based on his training and experience, he believed Miller had a gun, and so he "pulled the steering wheel to the right and bumped him." (Defs.' Mot. for Summ. J., Wilkinson Aff. ¶ 10.) Maselli saw Miller come into contact with the cruiser and fall on the ground. Wilkinson stopped the cruiser, crossed in front of the cruiser and drew his weapon. He testified that Miller bent over and picked up something off of the ground and then ran down an embankment through brush

toward Town Street.  Maselli testified he saw that the object on the ground was a gun, so he drew his weapon and ordered Miller to stop and not to pick up the gun.  Maselli pursued Miller to the right of the brush and trees, hoping to catch up with him and yelling "he's got a gun."  (Defs.' Mot. for Summ. J., Maselli Aff. ¶ 12.)

Wilkinson testified he saw Miller jump from the downhill embankment onto the sidewalk and drop the gun as he was running in between cars; Wilkinson also saw Maselli pursuing Miller on foot down the right side of the embankment away from the trees and brush.  Wilkinson saw Miller back track to pick up the gun. Wilkinson ordered Miller to leave the gun, but according to Wilkinson, Miller picked it up, crossed Town Street and ran toward Lucas Street.  Wilkinson radioed Maselli about Miller's gun.[6] Wilkinson got back into the cruiser, drove down the embankment to Lucas Street and drove to the Riverside Bradley projects.

### 5. Beard and Luzio join the pursuit of Miller

Hearing that Miller was running from the police, Beard drove his cruiser to Lucas Street to assist in the arrest.  Beard turned South onto Lucas Street, just north of Town Street where Luzio saw an individual who matched Miller's description running from the police.  Luzio testified he heard another officer or other officers shouting that Miller had a gun.  Beard, who knew Miller on sight,

---

[6]

There is considerable dispute between the parties as to whether Wilkinson said "B, he's got a gun," or "see if he's got a gun."  Wilkinson and Maselli testified that Wilkinson nicknamed Maselli "B," short for Bryan.  There is also a dispute about when in the sequence of events this transmission was aired.  The police department condensed the audio tape recording of the transmissions to delete any dead-air time.  Plaintiff argues that this distorted the internal investigation of the shooting as it related to any verification of the officers' versions of the incident.

saw Miller cross Town Street and head southwest toward Lucas Street.  Beard and Luzio passed Maselli on foot at this intersection and Maselli continued to trail them southbound on Lucas Street.

Luzio and Beard both testified that as the cruiser crossed over Town Street, they saw Miller (to the left of the cruiser) with a semi-automatic handgun in his right hand.  (Defs.' Mot. For Summ. J., Luzio Aff. ¶ 5; Beard Aff. ¶ 8.)  Luzio and Beard testified that Miller appeared to be trying to stuff the gun into the front of his pants while running.  Beard testified that he believed "Miller posed a risk of serious physical harm to myself, to other responding officers, and to anyone else who might cross his escape path."  (Defs.' Mot. for Summ. J., Beard Aff. ¶ 8.)

Beard stopped the cruiser ahead of Miller on Lucas Street, in between Town Street and Rich Street.  Beard and Luzio exited the cruiser with Miller running south toward them on the east sidewalk of Lucas Street.  Luzio testified that Miller "still had his gun." (Defs.' Mot. for Summ. J., Luzio Aff. ¶ 7.)

### 6. *Luzio and Beard pursue Miller on foot*

Beard testified he yelled at Miller several times to stop and give up his gun.  Miller passed Luzio, and Luzio began chasing him from behind, yelling for him to stop and give up the gun.  Beard ran ahead of Miller on his right (west) side, ordering him to stop and drop the gun.  Beard testified in his affidavit that Miller, still holding the gun in his right hand, turned in Beard's direction.  (Defs.' Mot. for Summ. J., Beard Aff. ¶ 10.)  Luzio testified that he saw Miller extend his right arm, holding the gun

in his right hand, toward Beard.  Luzio heard a shot fired[7] and he fired a shot immediately to protect Beard.  Beard fired one shot at Miller.  According to Beard, Miller did not stop, hesitate, or drop the gun, but continued running south.  Beard testified that he yelled at Miller to drop his gun and Miller looked at him and said, "no."  (Defs.' Mot. for Summ. J., Beard Aff. ¶ 11.)  Chapman, Surbaugh, and Wangler heard yelling and gunshots as they were exiting the south side of the warehouse on Town Street.

Beard testified that Miller again pointed the gun in his direction near the intersection of Lucas and Rich Streets, so Beard fired another shot at Miller.  (Defs.' Mot. for Summ. J., Beard Aff. ¶ 12.)  Luzio also observed Miller pointing the gun at Beard and so he too fired another shot to protect Beard.  (Defs.' Mot. for Summ. J., Luzio Aff. ¶ 9.)  Luzio heard another shot, but was unsure if Beard or Miller fired the shot.

### 7. *Miller reaches the courtyard of the Riverside Bradley Projects*

Miller crossed Rich Street, turned east, and ran into a courtyard at the Riverside Bradley projects.  Chapman and Surbaugh observed officers turning from Lucas Street onto Rich Street.  They ran south to the courtyard.

The courtyard was surrounded by apartment buildings on the east, west, and south sides, though there were openings between the buildings.  Luzio fell further behind Beard and Miller and saw them run into the courtyard.  Beard testified he observed Miller slow down and run toward the east side of the courtyard.  Beard slowed

---

[7]
From his testimony, it appears that Luzio did not know whether Beard or Miller fired the shot.

12

down, believing Miller was going to stop and fire his gun at him.

According to Beard, Miller then moved back to the center of the courtyard and stopped.  Beard stopped twenty to thirty feet from Miller and saw the gun in Miller's right hand.  Beard testified in his affidavit, "Miller began to turn his head to the right to look back over his right shoulder, to, I believed, locate my position so that he could shoot me." (Defs.' Mot. for Summ. J., Beard Aff. ¶ 15.)  Beard yelled "don't" and fired his gun.  From his spot on Rich Street, Luzio, who had not yet reached the courtyard, heard the gunshot.  Beard's shot struck Miller and Miller fell to the ground.

Beard testified in his affidavit he observed the handgun on the ground near Miller's right hand.  (Defs.' Mot. for Summ. J., Beard Aff. ¶ 18.)  Luzio entered the courtyard and observed Miller on the ground with a gun lying near his right hand with Beard standing near Miller.  Luzio covered Beard while Beard kicked the gun away from Miller's hand.  Wangler, Surbaugh, Maselli, and Chapman arrived on foot after the shooting and observed a handgun on the ground near Miller.  Beard called for a squad.  Luzio rolled Miller over and handcuffed him.  Wilkinson drove to the Riverside Bradley Projects and arrived after the conclusion of the events.

### D.  Additional Witness Testimony

In his deposition, West testified that once Miller came down from the embankment, he was again within West's vision and that he saw nothing in his hands as Miller was running.[8]  Miller testified

---

[8]

In his deposition, West stated that he did not know if Miller was pulling up his pants or holding a gun, but that he never saw a gun in Miller's hand while Miller was running.  He stated that he believed Miller was holding the gun and

that an officer jumped out of a Chevy Lumina and shot at Miller. After the first shot was fired, West testified that Miller turned his head around and looked at the officers behind him.  West testified he was approximately thirty feet from Miller when he was fatally shot in the back in the courtyard of the Riverside Bradley projects and that Miller clearly did not have anything in his hands.  West heard a shot fired and then saw Miller fall to the ground in the courtyard.  He also testified that he saw an officer kick a black and chrome object, what he presumed to be the gun, away from Miller after Miller fell to the ground.

Plaintiff has provided the deposition testimony of numerous other eyewitnesses to the shooting (Plf.'s Res. to Defs.' Mot. for Summ. J., Exs. E-M): Candace McClintock, David Tolbert, Leonard

---

his pants up at the same time, but he never saw the gun.

```
West testified:
Q.   After he came down from the hill, was he running?
A.   Yeah.  He came down a nice hill.  Came down a nice, hill, and he
     kept running.
Q.   Okay.  Now, you're gesturing with your arms going up and down in a
     manner as such that you would say that Daunte was running.
A.    Yes, sir.  And then he came by-off of -I mean, this had to be Rich,
     if I'm correct.  He came-He came past there and, like, soon as he
     got at the corner-when you come from under that bridge up by
     Riverside to go downtown over the bridge-as soon as he came right
     there, he, like, pulled up his pants.
****
Q.   Because you didn't see a gun, correct?
A.   No, sir, not when he pulled up his pants.
Q.   Right.  You just saw him pulling up his pants?
A.   Yep.  Thinking, like, "Well, the gun was pulling on his pants," and
     he was obviously pulling up his pants-
Q.   Right.
A.   -and he kept running.  Like, he didn't pull out no gun-
****
Q.   But you did see him and you believe he was holding the gun and his
     pants up at the same time at that point?
A.   Yes, sir.
Q.   Okay.  And that's your belief, right?
A.   Yes, sir.
Q.   And that's what you told Detective Dorn?
A.   Yes, sir.
```
(Defs.' Mot. for Summ. J., West Dep. 78:9-24; 80:9-18; 133:19-134-1).

Wilson, Jr., Daniel McGraw, Homer Franklin, Junila Foster, Tara Choate, and Shelia Hairston, who have testified that while they saw Miller continuously at various points during the chase from the time he descended down the embankment to the time he was shot in the Riverside Bradley courtyard, he did not have a gun in either hand and did not brandish anything at any officer. Each witness, however, with the exception of West who testified that he observed Miller from the time he descended down the embankment until the fatal shooting, did take their eyes off of Miller or lost sight of him at some point in the chase after Miller descended down the embankment.

**E.   The Investigation of Miller's Shooting**

On August 6, Defendant Patrick Dorn was a homicide detective for the Columbus Division of Police and was also a member of the Critical Incident Response Team ("CIRT"). CIRT investigates police shootings that cause death or serious injury. According to Dorn, CIRT investigates the shooting and then presents all of the information gleaned from the investigation to the Firearms Review Board, the chain of command within the department, and the Franklin County Prosecutor for presentation to the grand jury, which is exactly what CIRT did in this case. Investigators with CIRT interviewed and took statements from the eyewitnesses to the incident.

Upon reviewing the evidence presented through CIRT's investigation, the Firearms Review Board determined that the use of firearms in this instance was within the City's and department's policy. Suzanne Curmode, a member of the Firearms Review Board at the time of Miller's shooting explained in her deposition that

simply because some witnesses to the encounter did not see Miller with a gun did not mean that he did not have a gun or that his actions did not cause the officers to reasonably believe him to be an immediate threat to themselves or to others in the area.

### F. Plaintiff's Expert Witness Testimony

Plaintiff's proffered expert in forensic engineering of audio and video media, Kenneth Glaza, analyzed the audio tape of the radio transmissions which occurred during this incident. Glaza opined that Wilkinson said "see if he has a gun," not "B, he's got a gun."

Plaintiff's proffered forensic pathologist and toxicologist expert witness, Dr. Werner Spitz, opined in his deposition that Miller's right thumb was struck by a large caliber bullet[9] that caused fragmentation of his thumb in the fingernail area. Spitz also testified that it appeared that tissue and nail fragments from Miller's right thumb, and possibly fragments from the bullet itself, projected and struck Miller's thigh in a grazing fashion. Spitz surmised that the shooter of this bullet was in back of Miller. Spitz opined that the wounds to Miller's right thumb and thigh were caused by a different bullet than the bullet which struck him in the back and caused his death.[10]

## III. DISCUSSION

### A. Plaintiff's Excessive Force Claims against Defendants

---

[9]

Spitz defined large caliber bullets as .38, 9 millimeter, .357 or .45.

[10]

City of Columbus Criminalist, Mark Hardy, examined Miller's wounds and surmised that the bullet that struck Miller in his back ultimately struck Miller's right thumb after it exited Miller's abdomen and then struck the gun. Hardy, however, could not or did not determine whether the gun was underneath, or outside of, Miller's clothing.

16

### Wilkinson, Luzio, and Beard under § 1983

Plaintiff asserts claims against Wilkinson, Luzio, and Beard under § 1983 for using excessive and deadly force against Miller in violation of his Fourth Amendment rights. Specifically, Plaintiff claims that Wilkinson used excessive and deadly force in striking Miller with his cruiser. Plaintiff also claims that Luzio and Beard used excessive and deadly force in firing shots at Miller, including the two shots that struck him, one on his thumb and the other his fatal mid-back wound.

Section 1983 states in pertinent part:

> [e]very person who, under color of any statute, regulation, custom or usage of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws of the United States, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress[.]

42 U.S.C. § 1983. Accordingly, a plaintiff must show that a person acting under color of law deprived him of his rights secured by the United States Constitution or its laws. Berger v. City of Mayfield Heights, 265 F.3d 399, 405 (6th Cir. 2001). Defendants do not dispute that they acted under color of law during their encounter with Miller. Therefore, Plaintiff must show that Wilkinson, Luzio, and Beard deprived Miller of his rights secured by the United States Constitution or its laws.

### 1. Qualified Immunity

Defendants assert they are entitled to qualified immunity to the extent Plaintiff is suing them in their individual capacities

under § 1983.  Under the doctrine of qualified immunity:

> government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.

Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).

To defeat a claim of qualified immunity, a plaintiff must show: 1) the facts viewed in the light most favorable to the plaintiff show that a violation of the plaintiff's constitutional rights occurred and, 2) the constitutional right was clearly established.  Saucier v. Katz, 533 U.S. 194, 200 (2001).  For a right to be clearly established, "the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."  Russo v. City of Cincinnati, 953 F.2d 1036, 1042 (6th Cir. 1992) (citing Anderson v. Creighton, 483 U.S. 635, 639-40 (1987)).  The defendant bears the initial burden of demonstrating that he is entitled to qualified immunity; the burden then shifts to the plaintiff to show that the defendant's "conduct violated a right so clearly established that any official in his position would have clearly understood that he was under an affirmative duty to refrain from such conduct."  Gardenhire v. Schubert, 205 F.3d 303, 311 (6th Cir. 2000).

Whether or not a defendant is entitled to qualified immunity is a question of law.  Dominque v. Telb, 831 F.2d 673, 677 (6th Cir. 1987).  Summary judgment, however, is not appropriate if there is a factual dispute involving an issue on which immunity depends.  Poe v. Haydon, 853 F.2d 418, 426 (6th Cir. 1988) (citing Green v. Carlson, 826 F.2d 647, 652 (7th Cir. 1987)).

### 2. Which Constitutional Amendment Applies to Plaintiff's Excessive Force Claims

The Court must first determine which of Miller's constitutional rights Wilkinson, Luzio, and Beard allegedly violated. <u>Graham v. Conner</u>, 490 U.S. 386, 394 (1989) ("In addressing an excessive force claim brought under § 1983, analysis begins by identifying the specific constitutional right allegedly infringed by the challenged application of force."). Defendants argue that Plaintiff's § 1983 claims against Wilkinson, Luzio, and Beard must be analyzed under either the Eighth Amendment or the Fourteenth Amendment, because Miller's legal status as of August 6, 2003, was that of an absconder and not a free citizen. Plaintiff argues the 1983 claims must be analyzed under the Fourth Amendment. "Which amendment applies depends on the status of the plaintiff at the time of the incident, whether free citizen, convicted prisoner, or something in between." <u>Phelps v. Coy</u>, 286 F.3d 295, 299 (6th Cir. 2002).

The Fourth Amendment's objective reasonableness standard governs Plaintiff's claims if Miller was "a free person at the time of the incident and the use of force occurred in the course of an arrest or other seizure[.]" <u>Id</u>. (citing <u>Graham</u>, 490 U.S. at 395). On the opposite end of the spectrum, the Eighth Amendment applies to an individual who was a convicted prisoner at the time of the encounter. <u>Id</u>. (citing <u>Graham</u>, 490 U.S. at 395 n.10). The Eighth Amendment standard focuses on "'whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.'" <u>Id</u>. (citing <u>Whitley v. Albers</u>, 475 U.S. 312, 320-21 (1986)). Finally, the Fourteenth Amendment's due process clause "'protects a pretrial

19

detainee from the use of excessive of force that amounts to punishment.'" Id. (citing Graham, 490 U.S. at 395 n.10).

Miller was convicted of a Fifth Degree Felony and sentenced to two years of community control. Defendants allege that Miller fled before completing his sentence, and was not a free citizen; therefore, the Fourth Amendment's objective reasonableness standard is not applicable to Defendants' encounter with Miller. Defendants are correct that the Fourth Amendment does not apply post-conviction, Johnson v. City of Cincinnati, 310 F.3d 484, 491 (6th Cir. 2002), however, at the time of this encounter, Miller had not yet been convicted of violating his supervised release.

Neither party has provided any Sixth Circuit law on point on this issue,[11] however the Court notes that other federal appellate and district courts have not applied the Eighth Amendment to persons who are not incarcerated or imprisoned at the time of the encounter despite the plaintiff's status as a parolee. See Hillman v. Padilla, No. 04-624-KI, 2004 U.S. Dist. LEXIS 23777 (D. Ore. Nov. 10, 2004) (where plaintiff, a parolee, did not allege that he was incarcerated when the alleged encounter occurred, his excessive force claim lay under the Fourth or Fourteenth Amendments, as opposed to the Eighth Amendment). The Ninth and Tenth Circuits have applied the Fourth Amendment's objective reasonableness

---

[11] The cases cited by Defendants are not applicable. In Gravely v. Madden, 142 F.3d 345, 347 (6th Cir. 1998), the Sixth Circuit held that the Eighth Amendment would apply to an excessive force claim where the plaintiff's decedent was a prisoner who had escaped from a minimum security prison farm detail. U.S. v. Waters, 158 F.3d 933 (6th Cir. 1998) does not concern the appropriate legal standard to be applied to the excessive force claim of an individual suspected of violating the terms of his supervised release; rather, the case deals with the authority of a magistrate judge to conduct revocation-of-supervised-release hearings subject to de novo review by a district judge.

standard to excessive force claims by individuals on parol or on supervised release.  See Smith v. Wampler, 108 Fed. Appx. 560 (10th Cir. 2004) (applying Fourth Amendment standard to the excessive force claims of plaintiff who was "technically an inmate of the Colorado Department of Corrections as he was participating in a supervised release program for which he wore an ankle bracelet monitor"); Peoples v. Kimmey, 67 Fed. Appx. 506 (10th Cir. 2003) (applying the Fourth Amendment standard to the parolee plaintiff's excessive force claim); Ellis v. City of San Diego, 176 F.3d 1183 (9th Cir. 1999) (analyzing a parolee's excessive force claims under the Fourth Amendment).  Accordingly, this Court will apply the Fourth Amendment's objective reasonableness standard to Plaintiff's excessive force claims.

### 3.    The Fourth Amendment Standard

The right to be free from excessive force during an arrest is a constitutional right, conferred under the Fourth Amendment's prohibition against unreasonable seizures.  Graham, 490 U.S. at 393-94 (1989).  An officer's use of force is bound by a standard of objective reasonableness.  Id.

> Determining whether the force used to effect a particular seizure is "reasonable" under the Fourth Amendment requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake . . . .  [P]roper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.

Id. at 396. (citations omitted).   The Sixth Circuit has held that

"where factual disputes exist as to [these] considerations, summary judgment is not appropriate." Wilkey v. Argo, 43 Fed. Appx. 925, 928 (6th Cir. 2002) (citing Kain v. Nesbitt, 156 F.3d 669, 673 (6th Cir. 1998)) ("If plaintiff's version as to the nature and degree of force used is credited . . . a jury question is created as to whether the force used was excessive."). Finally, the most relevant inquiry is whether the force used was objectively reasonable from the perspective of a "reasonable officer at the scene, rather than with the 20/20 vision of hindsight." Graham, 490 U.S. at 396-97.

The use of deadly force is a seizure subject to the objective reasonableness requirement of the Fourth Amendment. Tennessee v. Garner, 471 U.S. 1, 7 (1985). The use of deadly force is not per se unreasonable in the apprehension of a felony suspect "'where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others[.]'" Robinette v. Barnes, 854 F.2d 909, 913 (6th Cir. 1988) (quoting Garner, 471 U.S. at 11).

Whether deadly force was applied must be determined from the facts and context of each case, including the officer's intent to inflict death or serious bodily harm in addition to the "probability, known to the officer but regardless of the officer's intent, that the law enforcement tool, when employed to facilitate an arrest, creates a 'substantial risk of causing death or bodily harm.'" Id. at 912.

### a. Wilkinson

Plaintiff claims that Wilkinson used excessive and deadly force in striking Miller with his cruiser. The Sixth Circuit has

22

noted that many law enforcement instruments have the potential to inflict deadly force, including a police officer's vehicle. Id.(citing Galas v. McKee, 801 F.2d 200, 203 (6th Cir. 1986)).

The facts of this portion of the encounter are not in dispute. Both Wilkinson and Maselli testified that they observed Miller, a convicted felon with a warrant for his arrest who was actively evading arrest by uniformed police officers in a marked police cruiser in an area known for high crime and drug-related activity, reach into the front of his right waistband area of his pants and make a jerking motion with his right arm and elbow from behind as they were chasing him.  Neither Wilkinson nor Maselli saw a gun, but both testified that they suspected that from Miller's arm movement and the positioning of his arm and hand that he was pulling a gun from his waistband.  Wilkinson, fearing Miller was going to shoot him, testified that as he was braking the cruiser he bumped Miller to distract and disrupt him.  This entire encounter took place in a matter of seconds.  Although Wilkinson testified that the bump with the cruiser did knock Miller to the ground, multiple witnesses including West observed Miller running down the embankment without any noticeable limp or other condition connoting any injury.

Plaintiff compares the facts at issue in this case to those in Buckner v. Kilgore, 36 F.3d 536, 540 (6th Cir. 1994), where a police officer positioned his cruiser in the path of two allegedly intoxicated juveniles driving motorcycles during a high-speed chase as a roadblock; the Sixth Circuit held that this was an unreasonable use of deadly force.  Accordingly, the Sixth Circuit affirmed the district court's grant of summary judgment denying the

officer qualified immunity based on the plaintiff's excessive force claim. Id. The facts of Buckner, where the court held that an officer violates a clearly established right if he "pulls his squad car onto a highway with knowledge or reason to know that an approaching motorcyclist will not have time or the ability to stop or otherwise safely avoid collision with the car," case are readily distinguishable from those in this case. Id.

Plaintiff argues, without presenting any evidence, that Miller had not made any furtive or threatening gestures and that Wilkinson admitted that he could not see Miller's hands at the moment he believed Miller to be pulling a gun from his waistband. However, as courts within this circuit have found, "the use of force may be reasonable even if the perceived danger did not exist in fact." Estate of Iturrdale v. City of Detroit, No. 95-CV-72956-DT, 1996 U.S. Dist. LEXIS 13112, at *10 (E.D. Mich. Jul. 29, 1996) (citing Sherrod v. Berry, 856 F.2d 802, 807 (7th Cir. 1988)).

Taking into account the undisputed nature of the facts of this portion of Miller's encounter with Defendants, the Court finds that Wilkinson had probable cause to believe that Miller posed a threat of doing Wilkinson or a third-party serious physical harm and consequently, Wilkinson's use of force would not be deemed unreasonable by a reasonable officer under those circumstances.[12] Defendants' Motion for Summary Judgment on Plaintiff's § 1983 excessive force claim is GRANTED as to Wilkinson.

### b. Luzio and Beard

---

[12]

Because the Court finds that Wilkinson did not violate Miller's Fourth Amendment right to be free from excessive force, the Court need not engage in the second step of the qualified immunity analysis as to Wilkinson.

Plaintiff asserts that Luzio and Beard used excessive and deadly force against Miller in shooting at Miller during the chase on August 6. It is undisputed that both Luzio and Beard, uniformed police officers, exited their marked police cruiser and, while chasing Miller on foot, fired shots[13] at Miller.

Plaintiff asserts that two gunshots actually hit Miller: one struck his right thumb and grazed, or caused debris to graze, his right thigh, and the other fatally wounded him in the back and abdomen areas. It is undisputed that Beard fired the fatal shot that struck Miller in the back. Plaintiff argues that "[t]he evidence . . . supports the conclusion that Luzio shot Miller in his right thumb and right thigh from behind." (Plf.s' Res. to Defs.' Mot. for Summ. J. 52.) Plaintiff presented testimony from Dr. Spitz that the bullet that struck Miller's right thumb and thigh came from behind Miller. Plaintiff also points to Hardy's conclusion that one of Luzio's bullets was found in Leonard Wilson's car, and the car was positioned to the south of Miller. Defendants do not address this evidentiary argument. Defendants instead argue that a reasonable officer in Luzio's position would have believed that Miller posed a danger, and therefore, Luzio did not violate Miller's right to be free from excessive or deadly force when shooting at Miller.

Luzio and Beard testified that they observed Miller running

---

[13]

The Sixth Circuit has held that firing a shot that misses at a fleeing felon is not a seizure under the Fourth Amendment. Cameron v. City of Pontiac, 813 F.2d 782, 785 (6th Cir. 1987) ("[d]eadly force standing alone does not constitute a seizure, and absent any physical restraint or physical seizure . . . cannot serve as the basis for a § 1983 cause of action anchored by the Fourth Amendment."). Therefore, to the extent that Luzio's and Beard's shots missed Miller, Plaintiff has not stated a claim for the use of excessive force in violation under the Fourth Amendment pursuant to § 1983.

with a gun in his right hand.  Luzio also testified that he heard an officer or officers shouting that Miller had a gun.

Luzio testified that upon exiting the cruiser and chasing Miller on foot, he fired two separate shots at Miller because Miller allegedly turned his gun in Beard's direction twice.  The second time Luzio fired a shot at Miller, he also testified he was responding to the sound of a gunshot, and was not sure if the shot came from Miller or Beard.  Beard similarly testified that he shot at Miller because Miller turned and pointed the gun at him or appeared to be about to turn and point the gun at him.

The Court finds that there is a genuine issue of disputed material fact as to whether Miller was running with the gun in his hand and pointed it at the officers.  Luzio has testified that he shot at Miller because he observed Miller running with the gun in his right hand and twice turn toward Beard and raise the gun.  Plaintiff, however, has presented evidence from several eyewitnesses to the chase, including West who testified that he never lost sight of Miller after Miller ran down the embankment, that Miller did not have the gun in his hand when he was running from Luzio and Beard, and that Miller did not point the gun at Beard.  Whether or not Miller was running with the gun and brandishing the gun at the officers is material, and in fact critical, to the determination of whether the force used against him was reasonable under the circumstances.  See Garner, 471 U.S. at 11-12 ("if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm deadly force may be used if necessary to prevent

26

escape").

As the Sixth Circuit has repeatedly found, "summary judgment is inappropriate where there are contentious factual disputes over the reasonableness of the use of deadly force." Sova v. City of Mt. Pleasant, 142 F.3d 898, 903 (6th Cir. 1998); Sigley v. City of Parma Heights, 437 F.3d 527, 536 (6th Cir. 2006). Here, the parties have presented different accounts of the shooting and the chase, and thus the Court cannot determine as a matter of law that Luzio's and Beard's actions in shooting Miller were not unreasonable applications of excessive force.

Accordingly, the Court must next examine whether Plaintiff has presented facts which, if true, would constitute Luzio's and Beard's violations of clearly established law. Id. at 537. As the Sixth Circuit has stated, "[t]he contours of the right must be clear enough to put an officer on notice that the actions he is taking are unlawful." Id. Again, assuming Plaintiff's version of the facts to be true for the purposes of this Motion, at the time of this incident in 2003, Luzio and Beard would have had fair notice that shooting Miller when he did not pose an immediate threat was unlawful under Tennessee v. Garner, 471 U.S. 1, 11 (1985). Therefore, the Court finds that neither Luzio nor Beard are entitled to qualified immunity and Defendants' Motion as to Plaintiff's claims of excessive force against Luzio and Beard is DENIED.

**B.  Plaintiff's § 1983 Conspiracy Claim Against Dorn, Luzio, and Beard**

Plaintiff asserts that Dorn, Luzio, and Beard conspired to deprive Miller of his constitutional rights by manipulating the

27

evidence at the scene of the shooting and thereby justifying the use of deadly force against Miller.

Plaintiff's theory is that Luzio or Beard removed the gun from Miller's waistband after he was shot; then Luzio took the magazine from the gun and planted it up the hill on the embankment where Wilkinson bumped Miller with his cruiser. Plaintiff argues that Luzio and Beard needed a reason why Miller never fired his gun, though he allegedly brandished it at Beard twice. Plaintiff maintains that to support Defendants' contention that Miller brandished, but did not fire, the gun, Luzio and Beard planted the magazine at the embankment so that they could argue that unbeknownst to Miller, the magazine fell out when he was struck by Wilkinson's cruiser. Plaintiff also alleges that Dorn "purposely assisted Lazio [sic] and Beard in his performance of the investigation, and guided them with their statements, to achieve consistency, avoid contradiction, and facilitate a finding that their uses of force were justified." (Pl.'s Res. to Defs.' Mot. for Summ. J. 76-77.)

Civil conspiracy is:

an agreement between two or more persons to injure another by unlawful action. Express agreement among all the conspirators is not necessary to find the existence of a civil conspiracy. Each conspirator need not have known all of the details of the illegal plan or all of the participants involved. All that must be shown is that there was a single plan, that the alleged coconspirator shared in the general conspiratorial objective, and that an overt act was committed in furtherance of the conspiracy that caused injury to the complainant.

Spadafore v. Gardner, 330 F.3d 849, 854 (6th Cir. 2003) (citation omitted). The Sixth Circuit has stated that "conspiracy claims

must be pled with some degree of specificity and that vague and conclusory allegations unsupported by material facts will not be sufficient to state a claim under § 1983." Id.

Defendants argue that Plaintiff's conspiracy claim fails as a matter of law under the intra-corporate conspiracy doctrine.[14]  The intra-corporate conspiracy provides that "employees of a corporation or governmental entity generally cannot be deemed to have conspired among themselves or with their corporate or governmental employer." Brunson v. City of Dayton, 163 F. Supp. 2d 919, 927 (S.D. Ohio 2001); see also Rivera v. City of San Antonio, No. SA-06-CA-235-XR, 2006 U.S. Dist. LEXIS 83376, at *14 (W.D. Tex. Nov. 15, 2006) (applying the intra-corporate conspiracy doctrine to a plaintiff's § 1985(3) conspiracy claims against a police department for fabricating a false story of events). Because Dorn, Luzio, and Beard are employees of the City, Defendants argue that under the intra-corporate conspiracy doctrine, they could not conspire to violate Miller's constitutional rights as conspiracy requires two or more persons or entities conspire.  The Court agrees.

Although the Sixth Circuit has recognized an exception to the intra-corporate conspiracy doctrine under which liability can be imposed upon employees acting outside the scope of their employment relationship, here Plaintiff has not alleged that any of Defendants acted outside the scope of their employment with the City.  See Johnson v. Hills and Dales Gen. Hosp., 40 F.3d 837, 841 (6th Cir. 1994); Brunson, 163 F. Supp. 2d at 927.  Accordingly, Defendants

---

[14] Plaintiff failed to address this argument.

29

Motion with respect to Plaintiff's conspiracy claim is GRANTED.

### B. MUNICIPAL LIABILITY UNDER § 1983

#### 1. City Liability

To prove a § 1983 claim against a municipality, a plaintiff must show that the alleged constitutional violation was caused by a municipal policy or custom. Monell v. Dept. of Social Servs. of the City of New York, 436 U.S. 658, 694 (1978). A municipality will not be liable under § 1983 "for an injury inflicted solely by its employees or agents"; a municipality may not be found liable under a respondeat superior theory for its employees' § 1983 constitutional violation. Id. To sustain liability, a plaintiff must first show that his constitutional rights were in fact violated by the municipal employees. Ewolski v. City of Brunswick, 287 F.3d 492, 516 (6th Cir. 2002).[15] A plaintiff must then show that the city's policy or custom was the moving force behind the constitutional violation. Polk Cty. v. Dodson, 454 U.S. 312, 326 (1981). See also Board of Cty. Commrs. of Bryan Cty., Okla. v. Brown, 520 U.S. 397, 404 (1997) (plaintiff must show that municipal action was taken with requisite degree of culpability and must demonstrate a direct causal link between the municipal action and a deprivation of federal rights); Garner v. Memphis Police Dept., 8 F.3d 358 (6th Cir. 1993) (plaintiff must identify policy at issue, connect the policy to the governmental body, and show that injuries were incurred because of the execution of the policy).

A plaintiff may attempt to prove a municipality's illegal

---

[15]

Because no constitutional violation occurred from Wilkinson's bumping Miller with his cruiser, the City cannot be liable for this conduct. Therefore, the only conduct which the City may be liable for under Monell is Luzio's and Beard's alleged uses of excessive and deadly force.

policy or custom by showing any of the following: 1) the municipality's legislative enactments or official agency policies; 2) actions taken by officials with final decision-making authority; 3) a policy of inadequate training or supervision; or 4) a custom of tolerance or acquiescence of federal rights violations. Thomas v. City of Chattanooga, 398 F.3d 426, 429 (6th Cir. 2005) (citing Pembaur v. City of Cincinnati, 475 U.S. 469, 480 (1986), Stemler v. City of Florence, 126 F.3d 856, 865 (6th Cir. 1997), and Doe v. Claiborne Cty., 103 F.3d 495, 507 (6th Cir. 1996)).

Plaintiff argues that the City and Jackson are liable under both the inadequate training/supervision theory and the tolerance of federal rights violations theory in failing to adequately investigate the uses of excessive force by its officers.

### 2.  Failure to Investigate

To prevail on a claim of failure to investigate or discipline, Plaintiff must prove that the City had a policy or custom of failing to act upon similar complaints of unconstitutional conduct. Andrews v. Fowler, 98 F.3d 1069, 1074-75 (8th Cir. 1996). Plaintiff must also prove that the City's policy was the "moving force" behind Miller's death. Monell, 436 U.S. at 694. See Searcy v. City of Dayton, 38 F.3d 282, 287 (6th Cir. 1994). Plaintiff must show that previous investigations of misconduct were inadequate, and must further show that this policy was the moving force in the officers' actions toward Miller. Brown v. Shaner, 172 F.3d 927, 931 (6th Cir. 1999) (city not liable where plaintiffs produced no evidence that city, on present occasion or in the past, failed to investigate and discipline for improper conduct where such discipline was justified); Mettler v. Whiteledge, 165 F.3d

31

1197, 1205 (8th Cir. 1999).

In support of her claim, Plaintiff first points to an undated letter from the Acting Assistant Attorney General in the Civil Rights Division of the Department of Justice to the Columbus City Attorney regarding Columbus Division of Police patterns and practices.[16]  The letter states that the Civil Rights Division had been conducting a civil investigation of allegations of police misconduct by City officers and that as a result of the investigation, "we have determined that CDP officers are engaged in a pattern or practice of using excessive force[.]" (Pl.'s Res. to Defs.' Mot. for Summ. J., Ex. AA, Columbus Findings Letter 1.)  The letter states that the Civil Rights Division reviewed, _inter alia_, internal files relating to over 300 citizen complaints of misconduct; documents from recent lawsuits against the City and officers relating to police misconduct; departmental "use of force" reports; and  policies and procedures of the department relating to the supervision and monitoring of officers, the receipt of citizen complaints, and the investigation and adjudication of the complaints.

With respect to the investigation's findings, the letter specifically states:

> incidents of police misconduct in Columbus frequently
> share many common elements.  Many of the victims of
> excessive force, false arrest or charges, and/or an
> improper search are, at the time when the misconduct
> occurs, carrying out some ordinary, routine daily
> activity (either not violating the law or committing some
> minor infraction).  Misconduct often is triggered by the

---

[16]

Plaintiff asserts this letter was issued in 1998 and preceded a 1999 lawsuit that the DOJ filed against the City relating to the findings in the letter.

> officer's perception that the victim in some way
> disrespected the officer, although often the victim's
> conduct in fact is relatively or completely innocuous.
> On other occasions, the misconduct stems from some
> emotional turmoil experienced by the officer resulting
> from some unrelated, prior occurrence, or involves other
> misconduct.

(Pl.'s Res. to Defs.' Mot. for Summ. J., Ex. AA, Columbus Findings Letter 1.)

The letter also states that the officers involved "many times have a history of complaints against them, and fail to report accurately to their superiors what transpired in the incident (changing the facts to portray the victim as responsible for the arrest, the use of force, and/or the search)." (Pl.'s Res. to Defs.' Mot. for Summ. J., Ex. AA, Columbus Findings Letter 2.) Finally, the letter notes that the investigation found that the misconduct was "tolerated by the failure of the CDP to adopt and implement proper management practices and procedures." (Pl.'s Res. to Defs.' Mot. for Summ. J., Ex. AA, Columbus Findings Letter 2.)

Specific procedural deficiencies enumerated in the letter and cited by Plaintiff include: inadequate academy and in-service training; the absence of an appropriate system for reviewing the effectiveness of training or reviewing individual incidents to determine the training needs of police personnel; a process for investigating the uses of lethal and non-lethal force that "is biased in favor of the involved officers"; and the absence of a comprehensive, effective system for monitoring and addressing patterns of conduct by individual officers, and unit-wide or Division-wide patterns of conduct. (Pl.'s Res. to Defs.' Mot. for Summ. J., Ex. AA, Columbus Findings Letter 2.)  Plaintiff argues

33

that the letter shows that previous instances of misconduct were not adequately investigated and that the City has a history of conducting biased investigations. This, she argues, is representative of a clear and persistent pattern of illegal activity, of which the City knew or should have known and yet to which the City remained deliberately indifferent. Plaintiff therefore argues that this custom was the cause of the excessive force in this case.

Defendants, however, argue that the letter, in addition to being inadmissible hearsay lacking any indica of reliability, is not timely and not relevant to the issues in this case. The Court agrees that the letter is irrelevant to show that any failure to investigate this incident was the moving force in causing Beard and Luzio to allegedly use excessive force against Miller.

The letter is ostensibly the result of an investigation of the department that occurred in, or before, 1998, five years or more before this incident took place. Plaintiff offers no evidence showing that any alleged problems the department and the City may have had with police misconduct and potentially biased investigation practices in 1998 remained uncorrected in 2003. The letter offers no specifics regarding the citizen complaints, uses of force, or allegedly biased investigation practices. In fact, many of the "common elements" of police misconduct uncovered by the investigation (victims carrying out ordinary, routine activities; police misconduct triggered by a perception of disrespect toward the officer or a result of emotional turmoil previously suffered by the officer; officers with a history of complaints against them) are not issues raised by Plaintiff in this case. The letter is

void of any references to complaints against any particular officers including Luzio and Beard.[17] The letter is also vague in explaining how the techniques the department used to investigate complaints and uses of force that resulted in bias in favor of the officers. The Court concludes that any evidence ostensibly presented through this letter has no bearing on whether the City's alleged failure to investigate or ratification of this incident was the moving force behind the alleged uses of excessive force.

Plaintiff alleges that the investigation of Miller's death was biased because there was no reconciliation of differing witness accounts; Dorn asked leading questions and ignored different accounts of the incident in his interviews of Luzio and Beard; certain CIRT investigation guidelines were ignored (including not videotaping witness interviews and the scene of the incident); Miller's clothing was not inspected for bullet exit holes; Hardy tested for tissue residue on Miller's gun after he had positioned and photographed the gun in Miller's hand on the autopsy table; Miller's latent fingerprints were not found on the gun (though they were found on the magazine of the gun) and this was not reported to the Firearms Review Board in the ballistics report; and the recordings of the officers airing reports on Miller's status were not preserved in real-time but were condensed to delete any dead-air time.

Here, it is undisputed that Miller's shooting was investigated. Members of CIRT interviewed numerous witnesses and

---

[17]
    A governmental entity is subject to liability for failing to act on complaints of misconduct by police officers only if it had a policy or custom of failing to act upon prior similar complaints of unconstitutional conduct. Andrews, 98 F.2d at 1074-75; Brown, 172 F.3d at 931.

officers.  According to Dorn, CIRT's function is to present the information gleaned from its investigation to the Firearms Review Board, the chain of command, and the Franklin County Prosecutor for presentation to a grand jury.  All of these steps were taken.  The fact that the investigators and the reviewers apparently chose to believe the officers' version of the incident does not establish that the City failed to conduct an adequate investigation into the incident.  And, while some of the techniques used by CIRT in this case may raise questions regarding the investigation as to whether the officers' use of force was within the City's policy, Plaintiff has not offered any evidence showing that any of these potential flaws were part of a clear and persistent pattern.  See Thomas, 398 F.3d at 433 (without showing more than the officer's potentially excessive use of force, the plaintiff's Monell claim against the city of Chattanooga could not survive the city's motion for summary judgment).

Plaintiff relies on Beck v. City of Pittsburgh, 89 F.3d 966, 974 (3d Cir. 1996) for the proposition that it is not enough that an investigative process be in place but that an investigation must be real.  Beck, however, presents an entirely different scenario than this case.  In Beck, the plaintiff presented evidence at trial (and presumably at the summary judgment stage in order to proceed to trial) that the individual officer who allegedly used excessive force against him had a litany of prior and post complaints for very similar conduct which the City of Pittsburgh had repeatedly ignored through its investigation process.  Id. at 973.  Here, again, Plaintiff has not alleged, much less produced any evidence of, any prior, similar complaints or conduct by Luzio or Beard of

36

which the City knew and ignored, thus precipitating the alleged use of excessive force against Miller.  Further, unlike in <u>Beck</u>, Plaintiff has not presented any evidence of prior investigations that were handled in a similar, allegedly biased, manner.

Plaintiff has failed to present evidence that raises a genuine issue of material fact as to whether the City had a policy or custom of failing to investigate uses of excessive force or conducting biased investigations which was the moving force behind the alleged use of excessive force against Miller.  Defendants' Motion as to Plaintiff's municipal liability claim for a failure to investigate and/or ratification of the use of excessive force is GRANTED.

### 3.  Failure to Train

To support a claim for municipal liability under the failure to train theory, Plaintiff must show that: 1) the training program at issue is inadequate to the tasks that the officers must perform; 2) the inadequacy is the result of the City's deliberate indifference; and, 3) the inadequacy actually caused Miller's injury. <u>City of Canton, Ohio v. Harris</u>, 489 U.S. 378, 388 (1989). Mere allegations that a particular officer was improperly trained or that a particular injury could have been avoided with better training are insufficient to prove liability on the part of the City. <u>Sova</u>, 142 F.3d at 904; <u>Walker v. Norris</u>, 917 F.2d 1449, 1456 (6th Cir. 1990).  A plaintiff must establish that the municipal action was taken with "deliberate indifference" to its known or obvious consequences. <u>City of Canton</u>, 489 U.S. 388.

Luzio and Beard participated in and graduated from a six month long program consisting of 800 to 900 hours of police classroom and

37

skills training that is required of all officers. After this training was completed, Luzio and Beard each completed an additional 200 to 350 hours of field training under the coaching and evaluation of more experienced officers. City officers are also required to regularly qualify for the use of firearms.

Plaintiff argues that she has raised a genuine issue of fact as to whether the City's police officers are trained to use deadly force before a suspect threatens them with serious physical harm. Plaintiff cites to the testimony of "Charmed,[18] Down[19] and Beard" to raise a question of fact on the issue of whether the City trains its officers contrary to the Supreme Court's teachings in Tennessee v. Garner, prohibiting the pre-emptive use of deadly force on a suspect who has not placed anyone in imminent danger.

In her deposition, Curmode, a member of the firearms board of inquiry in the shooting of Miller, testified that if a suspect has a gun and disobeys an order to stop running, an officer would be within policy to shoot that suspect. Curmode testified:

> Q. Does the Columbus Police Department use of deadly force policy say, Officer, listen, if a man has a gun and you see him running and you tell him to stop, you can shoot that man? Yes or no?
> A. He told him to stop and he does not. Yes, he poses an imminent threat of serious physical harm or death to others or yourself.
> Q. He's running, you saw him with a gun, you tell him to stop, he doesn't stop. You say you can shoot him?
> A. Our policy says yes.
> Q. Your policy–
> A. He still poses that threat.

---

[18] Presumably, Plaintiff means "Curmode."

[19] Presumably, Plaintiff means "Dorn."

> Q. All the police officer did was see him running with
>    the gun.  So the policy of the Columbus Police
>    Department says you can shoot him?
>    Mr. Mangan: I'm going to object.  There is a
>    specific policy.
>    The Witness: You have to objectively-you have to
>    objectively believe-you have to reasonably believe
>    that person poses a threat.  The threat is there
>    that they can cause serious physical harm or death
>    to yourself or the public at large.
> Q. A man is running with a gun.  Cop sees him running
>    with a gun.  He can shoot him in the back because
>    he didn't stop?
> A. Well-
> Q. Yes or no?
> A. If the gun is in his backpack, no.  If the gun is
>    in his hand, the possibility is there that he can
>    use that gun.  You cannot make a blanket statement
>    like that.  It depends on if that threat is there.

(Pl.'s Res. to Defs.' Mot. for Summ. J., Curmode Dep. 36:4-37:13, Aug. 24, 2006.)  Curmode further testified that if Miller had the gun while he was running and Beard knew or reasonably believed that Miller had the gun, but did not pull the gun out and point it at Beard and Beard could see both of Miller's hands and did not feel there was a threat, any shooting would not be within the City's policy.  (Pl.'s Res. to Defs.' Mot. for Summ. J., Curmode Dep. 56:18-58:3.)

In his deposition, Dorn testified, "per our policy, if an officer feels there was probable cause to believe that their life or the life of someone else is in jeopardy, they are allowed to use deadly force." (Pl.'s Res. to Defs.' Mot. for Summ. J., Dorn. Dep. 23:1-4, Sept. 11, 2006.)  As Plaintiff points out, Dorn also testified in response to Plaintiff's counsel's hypothetical question that whether or not a suspect had a gun in his hand, if an officer felt his life or someone else's life was in jeopardy, the

officer would be justified in shooting.  (Pl.'s Res. to Defs.' Mot.
for Summ. J., Dorn. Dep. 24-25.)

Plaintiff also points to an educational presentation by City
officer Joe Smith, a thirty year police veteran, on the use of
force.  Plaintiff argues that City officers are trained to be the
first to use force to eliminate any "reactionary gap" created by
waiting for a suspect to first use force.  In the hypothetical
scenarios, an officer is facing a visibly armed individual,
including a bank robber leaving the scene of the crime.

Curmode and Dorn testified that the key determination in the
City's deadly force policy is whether an officer reasonably
believed that the suspect posed an imminent threat to the officer
or to the public.  Luzio and Beard testified that in shooting at
Miller they saw him brandishing a weapon and believed he was a
danger to Beard and others in the vicinity.[20]  Smith's presentation
showed hypothetical situations where officers faced armed
individuals or criminal suspects.  Plaintiff has not pointed to any
evidence that raises a genuine issue of material fact as to whether
the City can be held liable for a failure to train its officers
within the confines of <u>Tennessee v. Garner</u>.  Accordingly,
Defendants' Motion with respect to Plaintiff's municipal liability
claim for a failure to train is GRANTED.

### C.   CHIEF JACKSON'S SUPERVISORY LIABILITY

Plaintiff claims that Jackson is liable in a supervisory
capacity.  In her Response, Plaintiff argues that the evidence

---

[20]
    While the Court has found that Plaintiff has presented evidence raising a
genuine issue of material fact as to whether Miller was actually brandishing the
gun, this determination is irrelevant to the City's training on the use of deadly
force.

would permit a reasonable jury to find Jackson liable in a supervisory capacity for acquiescing in the City's custom of failing to seriously investigate police shootings and for deliberate indifference in training City officers.

Liability based on "respondeat superior" is not cognizable under § 1983. Monell, 436 U.S. at 691-94. To establish a claim for improper supervision, Plaintiff must show that the supervisor encouraged the specific incident of misconduct or in some other way directly participated in it. Hall v. Shipley, 932 F.2d 1147, 1154 (6th Cir. 1991). Plaintiff must show at a minimum that the supervisor at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers. Comstock v. McCrary, 273 F.3d 693, 713 (6th Cir. 2001). The failure to investigate and discipline, where appropriate, may also give rise to § 1983 supervisory liability. Walker, 917 F.2d at 1457. However, this liability arises where no serious investigation is conducted. See Marchese v. Lucas, 758 F.2d 181, 188 (6th Cir. 1985). Further, a claim of failure to train is typically one brought against the governmental entity which employs the official. Matthews v. Jones, 35 F.2d 1046, 1049 (6th Cir. 1994).

It is undisputed that Jackson was not personally involved in, and did not participate in, the incident in any way. Nor has Plaintiff offered any evidence that Jackson implicitly authorized, approved, or knowingly acquiesced in the allegedly unconstitutional conduct of the officers.

Finally, even assuming that a supervisory failure to train claim could be asserted against Jackson in his individual capacity,

41

Plaintiff has produced no evidence to support her claim. As this Court has determined, _supra_, Plaintiff has not presented any evidence of inadequate training. Further, Plaintiff has not shown that Jackson was responsible for ensuring that Luzio and Beard received proper training, or that he was a policymaker for the City in matters of officer training or incident investigation.

Plaintiff has failed to produce evidence sufficient to show the existence of a genuine issue of fact on her claims of failure to supervise asserted against Jackson. Defendants' Motion as to Plaintiff's supervisory liability claims against Jackson is GRANTED.

**D.  STATE LAW CLAIMS**

    **1.  Intentional Infliction of Emotional Distress against Wilkinson, Luzio, and Beard**

To state a claim for intentional infliction of emotional distress, a defendant's conduct must be extreme and outrageous and the emotional distress suffered by the plaintiff must be severe and debilitating. _Yeager v. Local Union 20_, 453 N.E.2d 666, 671 (Ohio 1983); _Paugh v. Hanks_, 451 N.E.2d 759, 765 (Ohio 1983). A court may determine as a matter of law if the emotional distress suffered by the plaintiff is serious. _Id._; _Oswald v. Fresh/Mark Sugardale, Inc._, No. CA-8906, 1992 Ohio App. LEXIS 5756 (Ohio Ct. App. Nov. 9, 1992). Severe and debilitating emotional distress may be found "where a reasonable person, normally constituted, would be unable to cope adequately with the mental distress engendered by the circumstances of the case." _Paugh_, 451 N.E.2d at 765. "Ohio law has traditionally permitted recovery for negligently inflicted emotional and psychiatric injuries accompanied by contemporaneous

42

physical injury," so when a plaintiff suffers physical injury in addition to psychiatric injury, the latter need not be severe and debilitating to be compensable.  <u>Binns v. Fredendall</u>, 513 N.E.2d 278, 279 (1987); <u>Lucijanic v. City of Columbus</u>, No. 2:04-cv-751, 2006 U.S. Dist. LEXIS 19090, at **21-22 (S.D. Ohio April 13, 2006).

As to Wilkinson, the Court finds that Plaintiff has failed to present evidence showing that Wilkinson's bumping of Miller with his cruiser met the Ohio Supreme Court's high standards for extreme or outrageous conduct.  The only evidence before the Court shows that Wilkinson believed that Miller was drawing a weapon at the moment he bumped him with the cruiser and that the force of the cruiser striking Miller was minimal.  Accordingly, Defendants' Motion as to Plaintiff's intentional infliction of emotional distress claim against Wilkinson is GRANTED.

As to Luzio and Beard, the record contains sufficient evidence to raise a genuine issue of material fact as to whether they inflicted serious emotional distress on Miller by shooting at him. Luzio and Beard are not entitled to summary judgment on this claim.

## 2. **Statutory Immunity**

Defendants argue that they are entitled to immunity under Ohio Rev. Code § 2744.03(A)(6), which provides that employees of a political subdivision are immune from liability unless: "a) the employee's acts or omissions were manifestly outside the scope of the employee's employment or official responsibilities; b) the employee's acts or omissions were with malicious purpose, in a bad faith, or in a wanton or reckless manner; c) civil liability is expressly imposed upon the employee by a section of the Revised Code."  In this case, the first and third exceptions do not apply.

Because the evidence indicates that Luzio and Beard were acting within the scope of their employment performing a governmental function, they are immune unless evidence is presented that they acted outside the scope of their employment or "with malicious purpose, in bad faith, or in a wanton or reckless manner."  Oh. Rev. Code § 2744.03(A)(6)(b).

"Malicious purpose" is the "willful and intentional design to do injury, or the intention or desire to harm another, usually seriously, through . . . unlawful or unjustified" actions. Schoenfield v. Navarre, 843 N.E.2d 234, 239 (Ohio Ct. App. 2005) (quoting Cook v. Hubbard Exempted Vill. Bd. of Educ., 688 N.E.2d 1058, 1061 (Ohio Ct. App. 1996)).  "Bad faith" is more than mere bad judgment or negligence.  Id.  It connotes a "dishonest purpose, moral obliquity, conscious wrongdoing, breach of a known duty through some ulterior motive or ill will partaking of the nature of fraud."  Jackson v. McDonald, 760 N.E.2d 23, 29 (Ohio Ct. App. 2001) (quoting Jackson v. Butler Cty. Bd. of Cty. Commrs., 602 N.E.2d 363, 367 (Ohio Ct. App. 1991)).  One acts recklessly

> if he does an act or intentionally fails to do an act which it is his duty to the other to do, knowing or having reason to know of facts which would lead a reasonable man to realize, not only that his conduct creates and unreasonable risk of physical harm to another, but also that such risk is substantially greater than that which is necessary to make his conduct negligent.

Thompson v. McNeill, 559 N.E.2d 705, 708 (Ohio 1990) (quoting 2 Restatement of the Law 2d, Torts (1965) at 587, § 500).  "Wanton" conduct is the complete failure to exercise any care whatsoever. Fabrey v. McDonald Vil. Police Dep't, 639 N.E.2d 31, 35 (Ohio Ct.

App. 1994).

The evidence is sufficient to raise genuine issues of fact as to whether Luzio and Beard acted with malicious purpose, in bad faith, or in a wanton or reckless manner in shooting at Miller. These genuine issues of fact preclude summary judgment in Luzio's and Beard's favor on Plaintiff's intentional infliction of emotional distress claim. Accordingly, Defendants' Motion as to Plaintiff's intentional infliction of emotional distress claim with respect to Luzio and Beard is DENIED.

### 3.  Negligent Operation of a Motor Vehicle

Plaintiff asserts that the City is liable for Wilkinson's allegedly negligent operation of his cruiser. Plaintiff relies on Oh. Rev. Code § 2744.02(B)(2) which states:

> except as otherwise provided for in this division, political subdivisions are liable for injury, death, or loss to person or property allegedly caused by the negligent operation of any motor vehicle by their employees when the employees are engaged within the scope of their employment and authority.

Defendants argue that the City is immune to any liability because Wilkinson was responding to an emergency call and the operation of the cruiser did not constitute willful or wanton misconduct under Oh. Rev. Code § 2744.02(B)(1)(a). Plaintiff essentially concedes that Wilkinson was responding to an emergency call but argues that whether his actions were willful or wanton misconduct raises a question of fact for the jury's determination. The Court rejected this argument, _supra_, in its discussion of whether Wilkinson's application of force was reasonable under the evidence of the circumstances presented in this case. Construing the evidence presented in Plaintiff's favor, a reasonable jury could not

45

conclude that Wilkinson's actions were a demonstration of willful or wanton misconduct. Accordingly, Defendants' Motion for summary judgment is GRANTED as to Plaintiff's claim that the City is liable for Wilkinson's negligent operation of his cruiser.

**IV.  CONCLUSION**

For the forgoing reasons, Defendants' Motion for Summary Judgement is GRANTED IN PART and DENIED IN PART.

It is so ORDERED.

<u>s/James L. Graham</u>
JAMES L. GRAHAM
United States District Judge

DATE: March 26, 2007

46